# First District Court of Appeal
## State of Florida

_____

No. 1D18-2445

_____

WASTE PRO USA and WASTE PRO
OF FLORIDA, INC.,

    Appellants,

    v.

VISION CONSTRUCTION ENT,
INC.,

    Appellee.

_____

On appeal from the Circuit Court for Escambia County.
J. Scott Duncan, Judge.

September 18, 2019

B.L. THOMAS, J.

Waste Pro USA and Waste Pro of Florida appeal the lower court's nonfinal order certifying a Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") class for all customers who paid Waste Pro's "environmental fee." For the reasons that follow, we affirm.

### *Facts*

Waste Pro of Florida, Inc. provides waste disposal services to residential and commercial customers in Florida, including Appellee Vision Construction ENT., Inc., a Pensacola construction company.

Vision brought an action for alleged violations of FDUTPA and a claim of unjust enrichment against Appellant Waste Pro USA.[1] Vision alleged that two fees charged by Waste Pro, a "fuel surcharge" and an "environmental fee," were deceptive. With regards to the "environmental fee," Vision alleged that "[t]he Environmental Fee bears no relation to Waste Pro's increased environmental costs (or its actual environmental costs) it might incur and the proceeds it receives are not used to offset such increased costs." Vision asserted that, while the title "environmental fee" would lead a reasonable consumer to believe that the fees are used to offset environmental costs imposed by a regulator, the fees in fact are retained by Waste Pro.

Vision filed a class action complaint requesting that the court certify two classes under Florida Rule of Civil Procedure 1.220: a class composed of customers who paid the fuel surcharge fee, and a class composed of customers who paid the environmental fee.

At a class certification hearing, the court heard evidence that Waste Pro began charging the environmental fee in 2009 and has always charged it as a percentage of a base fee, unless a customer individually negotiated otherwise.

From 2008-2010, Waste Pro service agreements contained fill-in blanks labeled "fuel surcharge" and "environmental fee," and the back of the forms contained an explanation that Waste Pro "may adjust charges for increases in" charges for various items or services, such as landfill charges, fuel costs, or insurance premiums.

Beginning in 2011, the service agreements stated that "[a] fuel surcharge and environmental compliance cost recovery charge, calculated as a percentage of the Charge(s), will be included on your invoice."

Waste Pro's CFO testified that he could not recall Waste Pro incurring any environmental costs that it didn't have before 2009. He testified that he did not track any environmental costs that existed from 2006-2016. The CFO testified that he had never seen

---

[1] Appellant Waste Pro USA, Inc. is a holding company that owns multiple subsidiaries, including Waste Pro FL.

2

any calculations done for Waste Pro's environmental costs. At least once, the environmental fee increased from six to eight percent solely because a competitor's increased to eight percent; no analysis of environmental costs contributed to the increase.

Waste Pro's environmental expert submitted an analysis indicating that Waste Pro incurred between approximately $6.8-7.7 million in "major environmental expenses" between 2011 and 2015 and collected approximately $6.1 million in environmental fees in that time.

A Waste Pro corporate representative testified that Waste Pro's environmental costs are not netted against the environmental revenues it receives. The representative testified that no document provided to a Waste Pro customer contains an explanation of the environmental fee "except the website." The representative testified that he did not think Waste Pro's sales representative should inform customers that if Waste Pro's environmental costs decreased, the customers would still be charged an environmental fee; he testified that the sales representatives don't know what the environmental costs are and could not disclose them to customers.

A Waste Pro sales representative testified that he would inform customers inquiring about the environmental fee that it was intended to "try to recover part of the increased costs of compliance." Another Waste Pro sales representative, likewise testified that Waste Pro's environmental fee was used to recoup some of Waste Pro's environmental compliance costs. This representative testified that occasionally, customers inquiring about the environmental fee were directed to Waste Pro's website.

The website, in varying iterations, informed customers that the "Environmental Charge is related to our costs of meeting a high standard of environmental compliance set by internal management and external governmental regulatory agencies. . . . This charge will help support our costs to operate our collection, transfer, recycling and landfills in a safe and environmentally responsible manner." The website did not inform customers what Waste Pro's environmental costs were, or the method Waste Pro used to calculate the fee.

3

Waste Pro regional sales managers submitted affidavits stating that they are encouraged to, but are not required to impose the environmental fee, and they may reduce or waive the fee at a customer's request. Waste Pro's CEO and a Waste Pro corporate executive both testified that they wouldn't expect Waste Pro's customers to know what Waste Pro's environmental costs were.

Waste Pro submitted evidence that Waste Pro's five regional vice presidents had autonomy and discretion regarding whether to charge the fuel and environmental fees. Each region made its own determinations on whether to waive, reduce, or cap the fees.

Vision began contracting with Waste Pro in 2009 and was not charged an environmental fee until 2014. Waste Pro charged Vision the environmental fee on fewer than 10 of the 170 service invoices between Vision and Waste Pro. Vision continued using Waste Pro after filing suit in this case and was using it at the time of Vision President Garry Crook's deposition.

Vision paid environmental fees to vendors other than Waste Pro; Crook testified that Vision was sometimes charged an environmental fee by concrete companies. Crook testified that he assumed that the other companies were also imposing these fees to recover their costs for "environmental issues."

Waste Pro submitted affidavits from some putative class members stating that they understood that the environmental fee was intended to offset Waste Pro's total costs and would expect that those fees included a profit component. However, when Vision deposed these affiants, they stated that they did not draft or have personal knowledge of those statements in the affidavits and testified that they either had no knowledge of whether the environmental fee was intended to offset Waste Pro's total costs or believed that the fee was used to recoup environmental costs and not to generate profit.

The court issued an order granting certification for the environmental fee class and denying certification for the fuel surcharge class.[2] The court found that the environmental fee was

---

[2] The court did not certify the fuel surcharge class because the back of the service agreements contained language which could explain to a reasonable consumer that the fuel surcharge could

4

not charged to offset environmental costs, nor was it charged to recover costs associated with environmental compliance regulations set by government regulatory agencies.

The court found that, for the environmental fee class, Vision met the requirements of Florida Rule of Civil Procedure 1.220, holding that the class was of sufficient size, that Vision's claim arose from the same course of conduct by Waste Pro as other class members and that claim was based on the same legal theory, and that Vision was an adequate class representative. The court also ruled that the environmental fee class satisfied rule 1.220(b)(3), which requires that "common questions of law and fact predominate over individual ones." The court found that the fact that different customers may have had different agreements with Waste Pro did not defeat class certification, as the class included any customer who paid the environmental fee. The court ruled that "when analyzing the term 'environmental fee,' a reasonable consumer would likely conclude such a fee was used to compensate Waste Pro for those costs associated with environmental compliance regulations," not other costs that Waste Pro used the fee to cover. The court ruled that, because Waste Pro charged every class member using the same term, and never informed the members that those fees were not related to environmental costs, differences in individual contracts did not render class certification inappropriate.

The court ultimately certified an "Environmental Fee Class," defined as "[a]ll persons and entities who reside in Florida who paid, directly or indirectly, Waste Pro USA, Inc. and/or Waste Pro of Florida, Inc., an 'Environmental Fee' (or other similarly named fees) from April 7, 2011 to the date of the class notice."

*Analysis*

An appellate court "reviews a trial court's order on class certification for an abuse of discretion, examines a trial court's factual findings for competent, substantial evidence, and reviews conclusions of law de novo." *Sosa v. Safeway Premium Finance Co.,*

---

increase as fuel costs increased but was not directly tied to those costs. As Vision could not show that it received the back page, it was not an adequate representative of the class.

5

73 So. 3d 91, 105 (Fla. 2011) (citations omitted). The trial court's inquiry at the class certification stage is restricted "to the substance of the motion and not the merits of the cause of action or questions of fact for a jury." *Id.* at 105.

"To obtain class certification, the proponent of class certification carries the burden of pleading and proving the elements required under rule 1.220." *Id.* at 106. "This includes the four elements of rule 1.220(a)," i.e. numerosity, commonality, typicality, and adequacy of representation. *Id.* "In addition, the proponent of class certification must satisfy one of the three subdivisions of rule 1.220(b)." *Id.*

Vision sought certification under rule 1.220(b)(3), requiring Vision to show that "common questions of law or fact predominate over the individual questions of the separate members and that the class action be manageable and superior to other available methods of fairly adjudicating the controversy." *Volkswagen of America, Inc. v. Sugarman,* 909 So.2d 923, 924 (Fla. 3d DCA 2005). "[A] class representative establishes predominance if he or she demonstrates a reasonable methodology for generalized proof of class-wide impact." *Sosa*, 73 So. 2d at 111. "A class representative accomplishes this if he or she, by proving his or her own individual case, *necessarily* proves the cases of the other class members." *Id.* At issue here is whether Vision satisfied the predominance requirement.

Waste Pro argues that, because Vision must show that a reasonable consumer acting in the same circumstances would have been deceived by the environmental fee, resolution of the issue requires an inquiry into the sophistication and experience of each individual class member. Waste Pro asserts that individual questions therefore predominate over common ones and that the trial court thus abused its discretion by certifying the environmental fee class.

Vision alleged that Waste Pro's environmental fee violated FDUTPA because "[t]he Environmental Fee bears no relation to Waste Pro's increased environmental costs (or its actual environmental costs) it might incur and the proceeds it receives are not used to offset such increased costs." The complaint alleged that "Waste Pro incurs no discrete, identifiable 'environmental' or

6

'environmental compliance' costs at all," and that the environmental fee "is simply a hidden rate increase Waste Pro misrepresents to deceive its customers." *Id.* Vision asserts that the title "environmental fee" would lead a reasonable consumer to believe that the fee is used to offset environmental costs imposed by a regulator, but that the fees in fact are retained by Waste Pro.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat. (2018). A consumer's claim "for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Rollins, Inc. v. Butland*, 951 So.2d 860, 869 (Fla. 2d DCA 2006).

"To satisfy the first element, the plaintiff must show that 'the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances.'" *Carriuolo v. General Motors*, 823 F.3d 977, 983-84 (11th Cir. 2016) (quoting *State, Office of the Att'y Gen. v. Commerce Comm. Leasing, LLC*, 946 So.2d 1253, 1258 (Fla. 1st DCA 2007)). "Under Florida law, an objective test is employed in determining whether the practice was likely to deceive a consumer acting reasonably." *Id.* "That is, '[a] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.'" *Id.* (quoting *Davis v. Powertel, Inc.*, 776 So.2d 971, 973 (Fla. 1st DCA 2000).

"A class member's subjective sophistication or knowledge is irrelevant [where] the liability inquiry states objective elements." *Carriuolo*, 823 F.3d at 990. While the determination of whether an act is deceptive requires "an objective test," it also specifically requires consideration of whether the defendant's conduct was 'likely to mislead [a] consumer acting reasonably *in the circumstances,'* including the plaintiff's knowledge and level of sophistication." *James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecommunications, Inc.*, 275 F.R.D. 638, 645 (M.D Fla. 2011) (citing *Pop's Pancakes, Inc. v. NuCO2, Inc.*, 251 F.R.D. 677, 679 (S.D. Fla. 2008); *Egwuatu v. South Lubes, Inc.,* 976 So.2d 50, 53–54 (Fla. 1st DCA 2008).

7

Based on this construction, federal courts have held that resolution of the deceptiveness element of an FDUTPA claim involves objective and subjective considerations:

> The modification of "acting reasonably" by "in the same circumstances" indicates a hybrid standard that may be objectively established as to mindset but subjectively established as to context. The objective element—reasonableness—does not require the Court to consider the plaintiff's individualized state of mind. In other words, the plaintiffs' individualized dispositions or beliefs do not on their own negate or create a FDUTPA violation. On the other hand, the subjective element— that the circumstances must be similar—necessitates inquiry into the context of the alleged offense; that is, one can only assess reasonableness when the inquiry requires consideration of the factual circumstances that counsel a reasonable person to act in a particular way or hold a particular belief.

*In re Motions to Certify Classes Against Court Reporting Firms,* 715 F.Supp.2d 1265, 1277-78, 1282 (S.D. Fla. 2010). The subjective element does not necessarily create individualized issues so as to defeat class action: "In some cases, the subjective component of this standard can be met on a class-wide basis." *Id.* Federal[3] and Florida cases demonstrate that an inquiry into the sophistication of the plaintiffs to determine whether a defendant's actions were deceptive may or may not be necessary depending on the nature of the alleged deception and the representations of the defendant.

In some cases, the nature of the alleged deception, and the defendants' varying representations to different class members regarding the alleged deception, created individualized issues that precluded class certification.

---

[3] "Because Florida's class action rule is based upon Federal Rule of Civil Procedure 23, Florida courts may look to federal cases as persuasive authority in their interpretation of rule 1.220." *Seven Hills, Inc. v. Bentley*, 848 So. 2d 345, 352-53 (Fla. 1st DCA 2003).

In *Pop's Pancakes*, the plaintiff restaurant establishments alleged that a provider of CO2 beverage equipment violated FDUTPA by leasing equipment to plaintiffs and issuing property tax invoices which, unbeknownst to the plaintiffs, included an "administrative processing fee" which the defendants retained; plaintiffs alleged that this fee violated FDUTPA because the defendant "failed to disclose the fee, deceptively placed the fee on the invoice, misrepresented that the full amount of the property tax invoice was to be paid to a governmental agency as a 'pass-through fee,' and charged an unnecessary and excessive amount for the processing fee." 251 F.R.D. at 679. The plaintiffs' proposed class included every customer who was assessed the full administrative processing fee in any invoice. *Id.* at 680.

The Southern District stated that the proposed class included customers who were told before receiving the invoice that an administrative fee was included, and the class included customers who read the back of the invoice and understood that the "property tax" fee on the front of the invoice included an administrative fee. *Id.* at 684. Therefore, the Southern District held that plaintiffs' first two FDUTPA claims, that defendant failed to disclose the fee and deceptively placed the fee on the invoice, "would necessarily require an individual inquiry into each class plaintiff's knowledge and understanding regarding the fee." *Id.* at 685.

As to the plaintiffs' third claim, that the defendant failed to disclose that the administrative fee contained a large profit component, the Southern District rejected plaintiff's argument "that a deceptive invoice for one, would necessarily be deceptive for all . . . given the facts of this case." *Id.* at 686.

> In this case . . . the question of what is reasonable, particularly in light of the consumers being business entities, is predicated in large part, on what was understood by the customers when they read the property tax invoice, including consideration of what had been to be represented to them, or what their understanding was through their own reading of the back of the invoice. Thus, it is not the Plaintiffs' reliance that is at issue, but whether it was reasonable under the circumstances, which vary for each Plaintiff, for each Plaintiff to not

9

know that the property tax included an administrative processing fee.

*Id.*

The court therefore held that individualized questions predominated and class action was improper. The court distinguished its case from cases where "consumers had a one-time purchase or interaction with the defendant business and thus, there were no additional issues regarding other representations or negotiations between the consumer and that business." *Id.* at 687. "[I]n those situations, the deceptive nature of the receipt, invoice or ticket could be determined without inquiry into the knowledge of the consumer based upon other representations that might have eliminated any confusing and/or deceptive aspects of the receipt, invoice or ticket." *Id.* The court ruled that its case was distinguishable because the defendant's invoice did not reveal the entirety of the transaction between the parties, and "the lease agreements, the oral representations, the verbage [sic] on the back of the invoice, and any other interaction that the business may have had with the consumer must be considered to resolve whether the property tax invoice was deceptive." *Id.*

In *Egwuatu v. South Lubes, Inc.,* 976 So.2d 50, 51 (Fla. 1st DCA 2008), the defendant, doing business as Jiffy Lube, provided routine auto services, including oil changes. Defendant offered a service called "Signature Service Oil Change" for an advertised price of $27.99 plus an "environmental fee," which ranged from $1 to $2.50 per vehicle. *Id.* The plaintiff alleged that the imposition of the fee was deceptive in violation of FDUTPA, in that it appeared to be a tax that the company was collecting from consumers. *Id.*

This court held that the trial court properly denied class certification because the defendant employed a variety of different methods over the years to inform customers that the environmental fee was not a tax, including posting menu boards stating that the environmental fee was added for the handling of hazardous products; giving verbal explanations of the fee to customers who asked about it; posting in all of their stores a letter from the company president explaining the fee; and posting a fee notice explaining the environmental fee on written estimates exceeding $100. *Id.* at 53. This court also noted that some of the

10

class members also did business with other oil change companies, and those members "must have known that the environmental fee the defendants charged was not a tax, because the other oil change companies they were doing business with did not charge it." *Id.*

This court held that the trial court was correct in concluding "that an individualized inquiry would be required to determine the facts of each of the commercial customer's experience with the defendants and whether that customer knew that the fee was not a tax," thus causing individualized issues to predominate. *Id.* at 53-54.

In other cases, courts have determined that, based on the nature of the alleged deception and the representations made by defendants, an inquiry into the sophistication of each class member was unnecessary, and common issues predominated.

Individual FDUTPA causation issues predominate a class where each plaintiff "had a unique sales experience and exposure to varying allegations regarding" the claimed deceptive practice, while common issues predominate where the "defendant's conduct is the same as to all class members." *Perisic v. Ashley Furniture Industries, Inc.*, 2018 WL 3391359 at *6 (M.D. Fla. June 27, 2018); *Cox v. Porsche Fin. Servs. Inc.*, 330 F.R.D 322, 334 (S.D. Fla. 2019) (quoting *Bowe v. Pub. Storage*, 318 F.R.D. 160, 182 (S.D. Fla. 2015)). A key distinction is "that cases where the court did require individualized inquiries to determine FDUTPA causation, and therefore defeated predominance, arose in the context where different representations were made to different class members, and where some class members were aware of the deceptive conduct." *Cox*, 330 F.R.D. at 334.

Waste Pro identifies no record evidence establishing that it made different representations about the nature of the environmental fee to different class members. Waste Pro argues that regional vice presidents had autonomy to decide how to impose the fee and customers could negotiate the fee with salesmen, but Waste Pro does not assert that the salesmen or vice presidents informed any customer as to the true nature of the environmental fee. The record reflects that every customer who paid the environmental fee received the same representation from Waste Pro, and no class member was informed that the

11

environmental fee was not used to offset environmental costs. This course of conduct by Waste Pro does not create individualized questions.

Waste Pro also asserts that a damages inquiry will be so individualized as to preclude class certification. Waste Pro argues that an FDUTPA plaintiff's actual damages are the difference in market value between a deceptive and negotiated item. Waste Pro argues that each class member therefore will have to establish that it would have obtained other waste disposal services without paying an environmental fee for a total lower cost than Waste Pro's services.

However, there are two ways to measure actual damages in an FDUTPA claim: "(1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service." *HRCC, Ltd. v. Hard Rock Cafe International (USA), Inc.*, 302 F. Supp. 3d 1319, 1321 (M.D. Fla. 2016).

The measure of actual damages in cases "where the alleged deceptive practice is defendant's misrepresentation of why a fee is being charged and where the money for the fee is being transferred" is "the amount retained by defendant despite the representation that the amount will be transferred to a third-party." *Morgan v. Pub. Storage*, 2015 WL 11233111, at *1 (S.D. Fla. August 17, 2015). Here, Vision alleged that the environmental fee was deceptive, as it suggested that money collected through this fee would be used to offset costs imposed by regulators. If the class prevails on this claim, the actual damages will be the amount of environmental fees that Waste Pro retained. The damages inquiry will not be highly individualized, and the trial court did not abuse its discretion in granting class certification.

Based on the foregoing, because Waste Pro, through its allegedly deceptive "environmental fee," made the same misrepresentation to the entire class, common issues predominate over individualized ones. The trial court did not abuse its discretion in granting class certification.

Neither did the court fail to conduct a rigorous analysis. Before certifying a class, a trial court is required to conduct a "rigorous analysis" to determine that the elements of rule 1.220 have been met. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 867 (Fla.

12

2d DCA 2006). Waste Pro argues that the court failed to conduct this analysis, as the court "wholly ignored" key evidence and reached an incorrect conclusion on the rule 1.220 predominance requirement.

A court generally violates the "rigorous analysis" requirement when its order contains limited analysis or conclusory statements with no factual support. *See Seminole Cty v. Tivoli*, 920 So. 2d 818, 823-24 (Fla. 5th DCA 2006) (the defective order "contained neither rigorous analysis nor evidentiary support for its conclusion . . . only cursory, conclusory statements and no detailed findings of fact"); *Ford Motor Co. v. Morris*, 904 So. 2d 612, 613 (Fla. 1st DCA 2005) (reversing an order granting class certification where "the order certifying the class contains no findings of fact as required by Florida Rule of Civil Procedure 1.220(d)(1)"); *Vega v. T-Mobile USA, Inc.*, 564 F. 3d 1256, 1278 (11th Cir. 2009) (holding that, where the trial court's entire rule 23 analysis consisted of one conclusory sentence, "[t]he district court's omission of an independent and substantial, let alone rigorous, analysis of Rule 23(b)(3), *in addition to* the facts that Vega has not established predominance and likely has not shown superiority, further demonstrates that certification of this class was an abuse of discretion" (emphasis added); *InPhyNet Contracting Servs., Inc. v. Soria*, 33 So. 3d 766, 772 (Fla. 4th DCA 2010) (holding "[w]e agree that the court did not conduct a 'rigorous analysis' of the predominance factor" where it "made no analysis, other than" making one conclusory statement and "did not analyze any of the other issues involved in that determination").

Conversely, a court satisfies the rigorous analysis requirement where it "evaluate[s] written arguments," "consider[s] affidavits, deposition testimony, . . . discovery, documentation, and court filings that constituted the entire case file," "hold[s] a hearing where it entertain[s] argument from both parties," and makes findings that are "not conclusory because they demonstrate[] why—both factually and legally—the trial court" reached its conclusion. *Sosa*, 73 So. 3d at 118.

Here, the court conducted a three-day hearing, considered affidavits and deposition testimony, and issued a thirty-three-page order explaining its conclusions. Waste Pro essentially argues that the court's conclusions demonstrate that it failed to properly

consider the evidence before it, because if the court had conducted a rigorous analysis, it would have determined that a reasonable consumer with the same experience as Vision would not have been deceived by the environmental fee.

Waste Pro argues that the court ignored the fact that Vision paid environmental fees to other vendors other than Waster Pro. But Waste Pro does not establish how paying fees to other vendors cures the alleged deception of the fee.

Vision's president testified that he thought the fees charged by other companies were also used to offset regulatory costs that had been imposed on them. Waste Pro offers no support for its suggestion that paying an "environmental fee" to multiple vendors endows a customer with the knowledge that this fee will be retained by the imposer and not passed on to a regulator. In *Egwuatu*, the fact that some customers did business with other vendors who *did not* charge an environmental fee could have indicated to the customers that the defendant's fee was not a regulatory fee imposed on the industry uniformly. 976 So. 2d at 53-54. Here, the fact that Vision *did* pay environmental fees to vendors other than Waste Pro would not provide the same notice that such a fee served to generate profit for the entity imposing the fee.

Waste Pro also argues that, if the court had conducted a rigorous analysis, it would have concluded a reasonable consumer in Vision's circumstances would not believe the "environmental fee" reflected Waste Pro's exact environmental costs, due to evidence that the fee was only charged sporadically (despite the court stating in its order that Vision was only charged the environmental fee on a "somewhat inconsistent" basis). Waste Pro supports this contention with citations to *Berry v. Budget Rent a Car Sys., Inc.*, 497 F. Supp. 2d 1361 (S.D. Fla. 2007) and *Vorst v. TBC Retail Group, Inc.*, 2012 WL 13026643 (S.D. Fla. April 12 2012). However, in both of those cases, the purportedly deceptive fees were deemed to be non-actionable under FDUTPA because *the titles themselves* indicated that fees would be retained by the entities imposing them. *Berry*, 497 F. Supp. 2d at 1367 (the title "cost-recovery fee" implies that the company will keep the money collected as a "recovery for costs"); *Vorst*, 2012 WL 13026643 at *2

(the title "oil-disposal fee" implies that the company will "keep the fee for itself").

These cases do not support the conclusion that the title "environmental fee," standing on its own, would inform customers that the fee is for Waste Pro's profit and is not directly tied to regulatory fees. Other cases suggest that such a title *does not* convey this information. *See Deere Construction, LLC v. Cemex Construction Materials Florida, LLC*, 198 F. Supp. 3d 1332, 1339 (S.D. Fla. 2016) ("There is nothing in the term[] . . . 'environmental charge' that implies Defendants will keep the monies collected").

Waste Pro asserts that the court failed to consider the autonomy that Waste Pro's employees had in imposing the environmental fee. But the autonomy of certain employee to charge the environmental fee does not alter the fact that the fee, as alleged in Vision's complaint, was deceptively titled. If the "environmental fee" title is ultimately deemed deceptive, it will have been deceptive to each customer who paid it, irrespective of a regional vice president's discretion on whether to impose it.

Waste Pro argues that the court failed to consider the fact that service agreements in 2009 referred only to an "environmental fee," while the forms beginning in 2011 stated that the fee may be used to recoup "environmental compliance costs." Each form contained the label "environmental fee," a label which Vision alleged is deceptive standing alone. The fact that the 2011 form, but not the 2009 form, also refers to "compliance" does not mean that Waste Pro's representations were different for customers who agreed to the different forms. Vision alleges that the words "environmental fee" suggest that such a fee is collected in order to offset some fee imposed on the vendor by a regulator. The word "compliance" further suggests that the purpose of the fee is to offset some regulatory cost. So, a customer agreeing to the 2009 form and a customer agreeing to the 2011 form would both be led to believe that the "environmental fee" will be used to offset some environmental regulation.

Waste Pro argues that the court ignored evidence that Waste Pro does actually incur environmental costs. But the Vision's complaint alleged that the environmental fee "bears no relation to Waste Pro's increased environmental costs (or its actual

15

environmental costs) it might incur and the proceeds it receives are not used to offset such increased costs." There is no dispute that Waste Pro has environmental costs; the issue is whether the "environmental fee" is tied to these costs[4]. As the mere existence of environmental costs does not defeat Vision's claim, the trial court did not err in failing to discuss these costs in its order.

Waste Pro also argues that the court ignored the evidence that Vision continued to use Waste Pro's services even after filing suit in the present case. Waste Pro suggests that a customer's continued payment of a fee it has alleged is deceptive is fatal to an FDUTPA claim. Waste Pro cites to *Prohias v. Pfizer*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007) and *Sweeney v. Kimberly-Clark Corp.*, 2016 WL 727173 (M.D. Fla. February 22, 2016), to support this assertion. In *Kimberly-Clark*, the plaintiffs alleged that defendant's flushable wipes were not flushable, and the court found that the plaintiffs' continued use of the wipes after filing suit made the measure of damages too speculative, because the plaintiff continued to use the wipes for reasons other than flushability. WL 727173 at *5. And in *Pfizer*, damages were impossible to calculate where the plaintiff continued using defendant's product Lipitor for its cholesterol reduction, after alleging that the defendant falsely advertised about Lipitor's coronary benefits. In those cases, damages could not be calculated because the plaintiffs' continued use of the falsely advertised products established that the plaintiffs still received the usable wipes or cholesterol-reducing drugs they paid for despite the alleged deception.

Here, in contrast, Vision alleged that it paid a deceptive fee that purely profited Waste Pro, and, as stated above, its damages are the amount they paid in environmental fees. The damages calculation is not altered by Vision's use of Waste Pro's services after filing suit. Further, Vision presented evidence that it could have been subjected to liquidated damages, attorney's fees, and costs if it had refused to continue paying the environmental fee. Continued use of a product after alleging a deceptive practice does not always preclude damages, if the plaintiff has a "plausible

---

[4] Vision did allege that Waste Pro has no "discrete environmental costs," meaning no costs specifically tied to the environment.

reason" for continuing use. *See In re Light Cigarettes Marketing Sales Practices Litigation*, 751 F. Supp. 2d 196, 204 (D. Maine 2010) ("Regardless whether the plaintiffs in *Prohias* could not or did not allege a plausible reason for their continued purchases, the six Plaintiffs in this case have: they assert that they have continued to purchase light cigarettes because they are addicted to them"). Vision presented evidence of a plausible reason to continue using Waste Pro's services and paying the environmental fee, and that continued use does not preclude its FDUTPA claim.

Based on the foregoing, because the court thoroughly explained its reasons for certifying the environmental fee class, and because the evidence which Waste Pro claims the court "wholly ignored" does not support its argument that individualized issues predominate the class, the court's order indicates that it conducted the requisite "rigorous analysis" into whether Vision satisfied the elements of rule 1.220.

AFFIRMED.

RAY, C.J.,[5] and WINOKUR, J., concur.

---

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

---

Jerry R. Linscott, Julie S. Brady, Susan M. Johns, and Maureen Berard Soles of Baker & Hostetler, LLP, Orlando, for Appellants.

Charles Phillip Hall of Phil Hall, P.A., Pensacola; James M. Stephens of McCallum, Methvin & Terrell PC, Birmingham; J. Phillip Warren of Taylor, Warren & Weidner, P.A., Pensacola, for Appellee.

---

[5] Judge Ray substituted for an original panel member in this proceeding after oral argument. She has viewed the digital recording of oral argument.